(163 App. Div. 757)

## GLENS FALLS PORTLAND CEMENT CO. v. SCHENECTADY COUNTY COAL CO. et al.

(Supreme Court, Appellate Division, Third Department.  September 9, 1914.)

1. MECHANICS' LIENS (§ 115*)—ADVANCE PAYMENT TO AVOID LIEN LAW— REQUISITE PROOF.

That the owner made payments to the contractor in advance of the time required by the contract or had knowledge of the contractor's indebtedness to the lienors is not sufficient to charge the owner with liability to a materialman on account of such payments, in the absence of proof that

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

they were made to avoid Lien Law (Consol. Laws, c. 33) § 7, providing that any payment by the owner to the contractor before the payment becomes due, to avoid the provisions of the lien law, shall be ineffective against the lien of a materialman.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 150–159; Dec. Dig. § 115.*]

2. MECHANICS' LIENS (§ 279*)—ADVANCE PAYMENTS TO AVOID LIEN LAW—BURDEN OF PROOF.

In an action to foreclose a mechanic's lien for material furnished to a contractor, the burden was on plaintiff to prove its contention that a payment by the owner to the contractor before it became due was made to avoid the provision of Lien Law (Consol. Laws, c. 33) § 7, that any payment by the owner to the contractor before it becomes due, to avoid the provisions of such statute, shall be ineffective against a lien created before such payment actually becomes ·due.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 555, 556; Dec. Dig. § 279.*]

3. MECHANICS' LIENS (§ 115*)—ADVANCE PAYMENTS TO AVOID LIEN LAW—SUFFICIENCY OF EVIDENCE.

Evidence, in an action to foreclose a mechanic's lien for material furnished a contractor, *held* sufficient, as to all except one of the lienors, to show that a payment by the owner to the contractor before it became due was made to avoid the provisions of Lien Law (Consol. Laws, c. 33) § 7.

[Ed. Note.—For other cases, see Mechanics' Liens, Cent. Dig. §§ 150–159; Dec. Dig. § 115.*]

Kellogg and Woodward, JJ., dissenting.

Appeal from Trial Term, Schenectady County.

Action by the Glens Falls Portland Cement Company against the Schenectady County Coal Company, impleaded with others. From a judgment foreclosing a mechanic's lien (83 Misc. Rep. 552, 144 N. Y. Supp. 519), the coal company appeals. Modified and affirmed.

Argued before SMITH, P. J., and KELLOGG, LYON, HOWARD, and WOODWARD, JJ.

Edgar T. Brackett, of Saratoga Springs, for appellant.

Wm. Dewey Loucks, of Schenectady, for plaintiff-respondent.

George G. Schieffelin, of Schenectady, for defendants-respondents Knapp & Hotchkiss Lumber Co. and another.

George H. Smith, of Schenectady, for defendant-respondent Holland Sand Co.

Grant L. Stanford, of Schenectady, for defendant-respondent Miller Bros.

John J. McMullen, of Schenectady, for defendants-respondents Collins and others.

N. B. Spalding, of Schenectady, for defendant-respondent David Mahoney Co.

Luther A. Wait, of Saratoga Springs, for defendant-respondent Devenpeck Coal Co.

LYON, J. The important question involved in this litigation, which was instituted to foreclose a mechanic's lien, is whether the final payment by the owner to the contractor was made for the purpose of

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

avoiding the provisions of section 7 of the Lien Law (Consol. Laws, c. 33; Laws of 1909, c. 38), which provided that:

"Any payment by the owner to a contractor upon a contract for the improvement of real property, made prior to the time when, by the terms of the contract such payment becomes due, for the purpose of avoiding the provisions of this article, shall be of no effect as against the lien of a subcontractor, laborer or materialman under such contract, created before such payment actually becomes due."

The contract in question was made in September, 1911, and provided for furnishing the materials an; performing the labor necessary for the construction by the contractor, Booth, for the Schenectady County Coal Company, the appellant, of five reinforced concrete coal pockets, for the sum of $75,500, payments to be made monthly to the extent of 85 per cent. of. the architect's estimates, the final payment to be made 31 days after the completion of the contract, which as to the large pocket was to be February 1, 1912, and as to the four small pockets, June 1, 1912. The contract provided that the owner might retain, out of any payments due or to become due, sufficient moneys to indemnify it against any liens chargeable to the contractor; also, that before final payment should be made, the contractor should furnish to the owner a bond in the penal sum of $18,750 conditioned that the contractor should keep all the buildings in repair for the period of one year from the time of their completion. Upon undertaking the construction of the large pocket it was found that the laying of a concrete mat as a foundation to the pocket was necessary. This was done at an expense of $7,209.36, which was paid for as extra work, and accounts for the delay in the completion of the contract, but has no bearing upon the issues herein. On March 8, 1912, the appellant had paid Booth on account of the contract, and exclusive of the payment for the extra work of constructing the mat, $55,505, leaving unpaid upon the contract $19,995. The appellant then proposed to Booth that, if he would furnish it a surety bond in the penalty of $20,000 conditioned for the performance by him of the contract, it would pay him, in advance of the time specified in the contract, the said balance remaining unpaid thereon. March 15, 1912, Booth in acceptance of such proposition furnished said bond, and on March 19th the appellant paid him $15,000, and on March 26th, the balance of $4,995 in full of the contract price, and also of the extra work in constructing the concrete mat. Booth continued work upon the pockets until June 13, 1912, when he abandoned the contract, and on June 17, 1912, became a bankrupt, having then expended upon the contract, exclusive of the construction of the mat, $79,960.64. The surety company thereupon undertook the work of completing the contract and expended $8,000 thereon. Thereafter the appellant, claiming that the surety company had not fully completed the contract, which claim the surety company disputed, expended $2,000 upon the pockets. Commencing June 18, 1912, plaintiff and many of the defendants filed liens against the coal pocket properties, and in July, 1912, this action was brought to foreclose the lien of the respondent cement company.

The court in its decision, which is amply supported by the evidence, excepting in respect of the claim of the respondent cement company,

as hereinafter stated, found the facts practically as above stated, and also that during the month of March, 1912, the appellant acquired knowledge that contractor Booth, who was repeatedly asking the appellant for advance payments was embarrassed financially and in need of money to meet his payrolls; that there were unpaid claims against him for material and labor, and that he had misrepresented to the appellant the amount of the same, stating that the claim of the respondent cement company on account amounted to $579.40, whereas in fact it amounted to $1,358.40; that having constructive notice that he was owing other large sums of money to various other persons who had furnished materials for said contract, and having concluded that the appellant had mistakenly neglected to require of Booth before entering upon the contract the bond required by the contract to be given, although in fact the contract did not require such bond to be given until the time of making the final payment, and knowing that, although about $63,000 had been expended by Booth upon the work, it was but about two-thirds completed, and that Booth was liable to lose a very substantial sum in completing the contract, the appellant proposed to Booth to pay him the balance unpaid upon the contract upon his furnishing a bond as before stated. The court also found that the said final payment was made for the purpose of avoiding the provisions of article 7 of the Lien Law, and not in good faith, and that the respondent lienors were entitled to be paid for materials furnished and labor performed prior to March 26, 1912, but not subsequent to that date, and that as to such portions of their claims the said payment was not made in bad faith, and that the amounts included in the liens for labor and materials subsequent to March 26th were invalid. The court also found that the claim of the respondent cement company was valid to the extent of $1,584.80 and that the claims of defendant lienors were valid to the extent in the aggregate of about $1,800, and decreed foreclosure and sale of the properties, and the application of the proceeds to the payment of the liens and costs. From this decision the coal company alone has appealed, and the issue presented is whether the evidence satisfactorily establishes the conclusion arrived at by the trial court that the final payment was made by the appellant to contractor Booth prior to the time when it became due for the purpose of avoiding the provisions of the Lien Law.

[1, 2] The mere fact that the March payments were made to Booth in advance of the time required by the contract, or that the appellant had knowledge of the indebtedness of Booth to the lienors, is not of itself sufficient, under the present Lien Law, to charge the appellant with liability on account of such payments, but in addition thereto it must be shown, in order to avoid the effect of a payment as against a lien, that the advance payments were made for the purpose of avoiding the provisions of the Lien Law, and the burden of so proving is upon the person asserting it. Behrer v. McMillan, 114 App. Div. 450, 100 N. Y. Supp. 35; Tommasi v. Archibald, 114 App. Div. 838, 100 N. Y. Supp. 367; Hudson River Stone Co. v. Huntington, 143. App. Div. 99, 128 N. Y. Supp. 25; Wagner v. Butler, 155 App. Div. 425, 140 N. Y. Supp. 50.

[3] We think the finding of the trial judge that the payments made March 19th and 26th were made for such purpose was not warranted by the evidence as to the respondent cement company. Prior to making the payment of $15,000 on March 19th Ashton, the secretary and manager of the appellant, called Bayle, the president of the cement company, by telephone and asked him about Booth's indebtedness to the cement company, and said that the appellant was going to pay Booth in full the next day or two. Bayle stated in the conversation that he thought that so far as the indebtedness to the cement company was concerned Booth was all right. Bayle did not suggest that the appellant should not make such payment, nor request any protection of the cement company account. March 15th Ashton wrote Bayle a letter headed "personal," as follows:

"In taking up the matter further in relation to our telephone talk of a few days ago, I would like you to let me know how much cement as delivered to the Schenectady County Coal Company plants for Mr. Booth, you figure is unpaid for. I have of course, figured that while you hold notes for some of this cement, same is not really paid for until notes are paid; and also would like to ask if you are perfectly satisfied with Mr. Booth's responsibility, and willing to waive all claims against the Schenectady County Coal Company in the future."

So far as appears this letter was not answered. March 19, 1912, Ashton wrote Bayle the following letter:

"(Personal)

"Mr. G. F. Bayle, President, Glens Falls Portland Cement Co., Glens Falls, N. Y.—Dear Sir: Confirming conversation over telephone this morning, we have arranged to pay Mr. Booth in full for contract work at Schenectady, notwithstanding that contract is not completed. He is giving us a bond for the amount of money advanced. We gave him this morning a check for $15,000, which leaves a balance of $4,995. We will give him a check for this balance, within the next day or two.

"Yours very truly,   E. B. Ashton."

It was not until seven days later that the appellant made the final payment to Booth of $4,995. Ashton testified that the reason he wanted to let Bayle know that the appellant was to make final payment to Booth was because Bayle was a personal friend, and Ashton knew the cement company was furnishing all the cement for the construction of the pockets, and assumed that the cement company bill would be as large as any and was anxious that Bayle should know the situation, and what was going on. Booth was a large purchaser of cement, having other large contracts for concrete work, and was indebted to the cement company in a considerable sum, and evidently the cement company considered it better business to continue to furnish him cement and allow him to proceed with his contracts and take the chances of meeting with a loss, as Bayle told Ashton he thought Booth was good, than to endeavor to secure, by filing a lien, or enforce by action payment of his then indebtedness, as the cement company furnished him cement for his jobs up to the time he abandoned the contract, June 13, 1912; the amount furnished for the work upon the pockets being about $2,000. The cement company, however, received from Booth during that period payment of his note of $5,000.

Unquestionably at the time of making the final payment the officers

of the appellant had well-seated suspicion of the ability of Booth to meet his obligations. They were constantly being annoyed by his importunities for payments. They had learned that his statement to them in answer to their inquiry as to the extent of his indebtedness was not true, but that the claims of creditors were much larger than he had stated to them. They knew that he must lose a considerable sum upon his contract for the construction of the coal pockets. That they anticipated financial difficulties is apparent from their desire to get the moneys which they would owe Booth upon his fulfillment of the contract out of their hands. That the possibility of resort being had to liens was considered by both the appellant and the respondent company seems to be evidenced by the letter of March 15th in which Ashton asked Bayle if he was entirely satisfied with Booth's responsibility, and willing to waive all claims against the coal company in the future. The purpose of the appellant in giving the cement company full and timely information of its intention to make final payment to Booth was evidently to give that company ample opportunity to collect or secure its claim, rather than to avoid the provisions of the Lien Law. As to the other respondent lienors, to none of whom notice was given by the appellant of its intention to make final payment to Booth, the evidence amply sustains the decision of the trial court that the payments of March 19th and 26th were made in advance for the purpose of avoiding the provisions of the Lien Law. However, the appellant contends that there would not have been sufficient funds in its hands for the satisfaction of the respondents' liens, had these advance payments been withheld until the time when they would have become payable under the terms of the contract. The disbursements aggregating $8,000 made by the surety company towards the completion of the contract must be considered as having been made by Booth, and hence are not to be deducted as against the lienors from the moneys payable under the contract. There was thus left on hand, even after deducting the $2,000 expended by the appellant in alleged completion of the buildings, upwards of $3,500, or far more than sufficient to satisfy the liens of the lienors respondent other than those of the cement company. But the appellant contends that this surplus may be absorbed by the expense of keeping the buildings in repair for one year from the time of their completion as mentioned in the contract. However, the contract did not permit the appellant to withhold the payment of any portion of the contract price during such year, but provided that the appellant should make final payment 31 days after the completion of the work, although that before the same should be made the contractor should furnish to the owner the bond, hereinbefore mentioned, in the penal sum of $18,750 conditioned for his so doing. This provision the appellant waived by making final payment without requiring such bond, taking the bond of the surety company conditioned that "Booth shall in all respects comply with and perform the terms and conditions of the agreement entered into between Booth and the coal company," under which clause it may be assumed the appellant will contend that the surety company is holden to perform the covenant to keep the buildings in repair for one year from the time of their completion.

As to the credit of $1,277.30 for bags returned, it is not material, in view of our holding as to the invalidity of the lien of the respondent cement company, whether in the absence of specific instructions as to the application of this sum, which in fact was credited by the cement company to Booth's account generally, the credit should be applied to his indebtedness incurred previous or subsequent to March 26th.

The decisions of the trial court should be modified by reversing the decree as to the cement company and dismissing the complaint upon the merits with costs, and by affirming the decree as to the other respondent lienors with costs.

The court disapproves of findings Nos. 17 and 18 so far as they find that the payments of March 19th and 26th, aggregating $19,995, were made, as to the said cement company, for the purpose of avoiding the provisions of the Lien Law, and that the said cement company is entitled to be paid the amount of its said claim, and substitutes a finding that as to said cement company said payments made in advance were not made for the purpose of avoiding the provisions of the Lien Law, and that said cement company is not entitled to be paid by appellant or to enforce its lien for any sum whatever. All concur, except KELLOGG, J., who writes for reversal in which WOODWARD, J., concurs.

JOHN M. KELLOGG, J. (dissenting). The original contract price was $75,500, of which 85 per cent. was to be paid on estimates of the architect from time to time as the work progressed and the remaining 15 per cent. ($11,350) was to be paid 30 days after the completion of the contract. In March, 1912, the work done (about two-thirds of the requirements of the contract) had cost $65,300. The payments to the contractor at that time aggregated $55,505, leaving apparently over $32,000 of work to be done by the contractor for which appellant was to pay $19,995. He was urging that more money be paid to enable him to continue the work, and was apparently in embarrassed circumstances. It was agreed, in March, 1912, in order to facilitate the work and secure the completion of the contract, that the appellant would pay to him the balance of the contract price; he giving to appellant a surety bond for the completion of the work. The bond was given, the balance paid, and the contractor continued the work until June 13, 1912, when he abandoned it. The architect's certificate shows that the cost of the work and material in place at that time was $83,300. The surety upon the bond was required to continue the work, and expended $8,000 thereon. The appellant spent $2,000 as it claims in the completion of the contract after the surety claimed the contract was performed. The total cost of the work, therefore, was $90,300, or $92,300 if the amount expended by the owner is allowed. No attention has been paid to the extra work which was paid for and does not enter into this controversy. The plaintiff, a large creditor, was notified in advance that the advance payments were to be made unless it objected, and it apparently was willing to look to the contractor for its pay. Certainly as to it no question can arise as to the entire good faith of the appellant; the

owner was not seeking to avoid the provisions of the lien law as to that creditor. It is quite evident if the advance payments had not been made that the work would not have progressed and the appellant would have sustained a great loss and the present lienors would have had no interest in the contract. Clearly the payments were not accelerated for the purpose of defeating the lien law, but for the sole purpose of protecting the substantial rights of the appellant. It did what was necessary for its own protection and was well within its rights. It was not seeking to favor the contractor or to prejudice the materialmen, subcontractors, or laborers. Apparently they were as well off when the contractor abandoned the work as they would have been if the crises had occurred in March when the agreement was made.

Section 7 of the Lien Law is a reasonable provision and simply requires that the owner shall not accelerate payments for the purpose of defeating the liens which may be filed against the property. Where a payment is accelerated for good and sufficient reasons for the necessary protection of the owner, and only to the extent reasonably necessary for his protection, it cannot be claimed that such payment was made for the purpose of avoiding the provisions of the act. It is not material just how many dollars and cents were actually expended in completing the work; it was reasonably within the contemplation of the appellant at the time that the entire payments advanced by it would be necessary for the completion of the work. In so large a transaction where the figures so nearly approach each other there is no foundation for the claim that the act was prompted by any ulterior or improper purpose. The reasonable intendment of good faith is sufficient under the circumstances of this case to protect the payment made by the appellant. Had the Legislature intended that under no circumstances should the owner make payments to the contractor prior to their becoming due, it could have made the intent clear by saying so. It did not do this, but provided that a payment made before it becomes due should be of no effect as against the subcontractor, laborer, or materialmen "if made for the purpose of avoiding the provisions of this article." It would seem to follow that any payment made for any other legitimate purpose remains unaffected by the statute. The mere fact that the owner knows that a contractor is indebted to laborers, materialmen, or subcontractors is not sufficient to charge upon him an improper purpose in making the payments. When the evidence is all in, the payments must be allowed unless it appears that they were the result of a purpose to avoid the statute. If it appears that it was for the sole purpose of continuing the work and enabling the contractor to perform his contract and was reasonably necessary therefor, the payment is valid. Wagner v. Butler, 155 App. Div. 425, 140 N. Y. Supp. 50; Hudson River Blue Stone Co. v. Huntington, 143 App. Div. 99, 128 N. Y. Supp. 25.

I favor a reversal of the judgment.

WOODWARD, J., concurs.